## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

WILLIE PONDER,

     Petitioner,

v.                                        Case No. 4:17cv217-RH-HTC

SECRETARY DEPARTMENT OF CORRECTIONS,

     Respondent.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Petitioner Willie Ponder's ("Ponder") amended petition for writ of habeas corpus under 28 U.S.C. § 2254. ECF Doc. 6. The matter was referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B). After considering the amended petition, the State's response (ECF Doc. 25), and Ponder's reply (ECF Doc. 35), the undersigned recommends the Petition be **DENIED** without an evidentiary hearing.

Ponder's petition is premised on five grounds: (1) defense counsel was ineffective for failing to object to testimony referring to "word on the street" identifying Ponder as the shooter; (2) defense counsel was ineffective for failing to

object to the lineup presented to the victim and a witness; (3) defense counsel was ineffective for failing to impeach witness Breanna Morgan's testimony; (4) newly discovered DNA evidence establishes that Ponder is "actually innocent"; and (5) defense counsel was ineffective for failing to move to dismiss the charging document.  For the reasons set forth below, the undersigned finds that grounds (4) and (5) are procedurally defaulted and the state court's adjudication of the remaining grounds on the merits was not contrary to clearly established federal law or based on an unreasonable application of the facts to the law.  *See* 28 U.S.C. § 2254(d).

## I.    Background

### A.    Factual Background

The following relevant factual background is taken from the trial transcript, which starts with Exhibit B3, ECF Doc. 25-2 at 68.

#### 1.  The Offense

At approximately 9:30 p.m. to 10:00 p.m. on November 17, 2009, Jamil Gardner, Breanna Morgan, and William Barr drove together to a house on Cypress Lake Road in Tallahassee, Florida, to pick up Gardner's friend Greg Sharp.  As they pulled up, they saw Sharp and his girlfriend arguing and stopped just around the corner from them.  Gardner and Barr exited their SUV while Morgan remained inside.  Once outside the vehicle, Gardner saw two males and a female get out of another vehicle parked nearby.  ECF Doc. 25-2 at 97-101.

One of the males, later identified as Petitioner, came over and began arguing with Barr until Barr removed his shirt, getting ready to fight. *Id.* At some point, Sharp and his girlfriend also came over, having stopped their argument. Ponder then began arguing with Sharp and his girlfriend. After a few moments, Gardner tried to get Sharp to get in the car to leave, but Sharp told him to go and get the "Glock .40." Ponder asked Gardner, "you've got a Glock .40?" as he pulled a gun out and aimed it at Gardner from around three to four feet away. ECF Doc. 25-2 at 101-06.

Gardner attempted to slap the gun down and punched Ponder in the face, knocking him to the ground. As Ponder fell, the gun fired, and a bullet struck Gardner in the leg. Gardner ran, but soon fell and realized he was shot. He struggled to get up and Ponder approached him once again. While he lay there on his back, Ponder came up and stood directly over him, aiming the gun at him. Ponder fired two shots which hit Gardner and ran off. ECF Doc. 25-2 at 107-09. Gardner managed to get up and get back into the SUV with Morgan, Barr, and Sharp.

### 2. Ponder Is Identified as the Shooter

Gardner was subsequently taken to the hospital. While there, Gardner was interviewed twice by investigator, Angie Booth. The first interview occurred on the first day Gardner was in the intensive care unit. Gardner told Booth he had heard from family and friends that the name of the person who shot him was Ponder. *Id.* at 122, 149, 253. Gardner added, however, that he did not know Ponder. *Id.* at 253.

The next interview occurred as Gardner was being discharged. *Id.* at 257-58. Booth showed Gardner a photographic lineup that included a photo of Ponder. *Id.* at 126. ECF Doc. 25-2 at 124-25. Booth did not tell Gardner the shooter's picture was definitely in the array of photographs. *Id.* at 126. Gardner selected Ponder from the lineup. A couple of weeks later, on December 6, 2009, the police showed Morgan, who was also present during the shooting, a photo array that included Ponder's photo and asked Morgan to see if she recognized the shooter. Morgan also identified Ponder as the shooter.

Based on the two identifications, a warrant was issued for Ponder. *Id.* at 262. Officer Gavin Larremore testified at trial that on December 6, 2009, he received a tip as to Ponder's location – a woman's apartment in Buckingham Apartments. *Id.* at 262. When officers reached the apartment, the woman told them that Ponder was not present. *Id.* at 263. The officers eventually located Ponder hiding in the attic. *Id.* After fifteen minutes of ordering him to come out, Ponder came out and was arrested. *Id.*

### 3. The trial

Gardner testified at the trial regarding his identification of Ponder as the shooter. Gardner testified he was able to see Ponder's face clearly and described him as around 5'8", 160-70 pounds with a "low cut" hairstyle, wearing a "[b]lack hat, black T-shirt, and black pants." ECF Doc. 25-2 at 106 & 142. Gardner

described the gun as a black revolver. *Id.* at 107. Also, Gardner was asked at trial if he noticed if the gunman had any tattoos. Gardner answered, "I couldn't see any tattoos. It was dark." *Id.* at 134. A picture of Ponder's tattoos was entered into the record at trial. ECF Doc. 25-4 at 28.

Gardner testified regarding how he identified Ponder in the photo lineup. According to Gardner, he recognized Ponder's face in the lineup "[f]rom when [he] got shot," stating "I remembered his face." *Id.* at 127. Gardner was asked if he had seen Ponder's picture prior to the lineup in any other way, such as in the news. *Id.* He responded, "No, ma'am." *Id.*

Gardner was also asked about his mental state at the time he reviewed the photographic lineup, because he had testified previously at his deposition that "as soon as I looked at it, I could – I spotted him right off the bat, even though I – you know, just being disoriented or whatever." *Id.* at 130. When asked at trial what he meant by "disoriented," he testified: "at the time I looked at the lineup, I was not on medication or anything. They had stopped medication before – right before I got discharged. But I still had been taking medication, so I had to make sure that I wasn't just picking somebody out that looked like him." *Id.* at 131. He also stated that he was not "under the influence of anything that affected [his] ability to look at those photographs and see or try to identify the person who shot [him]." *Id.* Booth also

testified that Gardner did not seem disoriented, seemed normal, and was able to understand what he was saying to her. *Id.* at 257.

Gardner was also shown a picture of a hat recovered from the crime scene and testified he recognized the hat because "[i]t was on the Defendant's head." ECF Doc. 25-2 at 115. The hat was tested for DNA and, although it contained usable DNA from three or more donors, Ponder was excluded as a potential donor. *Id.* at 181-83.

Morgan also testified at trial regarding her identification of Ponder as the shooter. She testified she did not previously know Ponder and had never seen a picture of Ponder prior to being shown a lineup at the police station. *Id.* at 221-22. Morgan was shown three sheets containing photo arrays, including the same photo array sheet that was shown to Gardner. She told the officer that the shooter was not on the first two but was on the third one she was shown. *Id.* at 209-10.[1] Like Gardner, she also selected number five (Ponder) from the lineup, but wrote, "[i]t's not really positive, but if I was in person I can show you him." *Id.* at 223-24. She

---

[1] This part of Morgan's testimony was given during the proffer with just the judge and the attorneys present. During her trial testimony, she was only asked about the third lineup that contained Ponder's photo. Thus, the jury did not hear the evidence of Morgan looking at three photo arrays instead of just the one that contained Ponder's picture.

testified that she also crossed out the word "positively" in the sentence confirming that she had "positively identified" the shooter. *Id.*

Morgan was asked if Gardner had shown her a picture of Ponder prior to her interview on December 4, 2009. She stated, "No. He mentioned his name, but he never showed me a picture."[2] *Id.* at 225. She also testified that she had not seen a picture of Ponder from any other source prior to her identification of him from the photographic lineup. *Id.*

On January 14, 2011, Petitioner was found guilty as charged of Attempted First Degree Murder in Case No. 09CF3864A. Ex. B1 pp. 94-95, in ECF Doc. 25-1. The jury also found that Petitioner discharged a firearm and caused great bodily harm during the commission of the offense. *Id.* Petitioner was adjudicated guilty on March 9, 2011 and sentenced to life in prison as a Prison Releasee Reoffender with a twenty-five year minimum mandatory for using a firearm during the commission of the offense. *Id.* at 98-107.

### B. Procedural History

Petitioner appealed his judgment and sentence to the First District Court of Appeal ("1st DCA"), *id.* at 108, which *per curiam* affirmed his judgment and

---

[2] Gardner testified that, after leaving the hospital, he told Morgan he had identified the shooter in a photo lineup but denied telling her the name Willie Ponder. *Id.* at 152-53.

sentence without written opinion on February 28, 2012. *See Ponder v. State*, 80 So. 3d 1026 (Fla. 1st DCA 2012); Ex. B9, ECF Doc. 25-5 at 39.[3]  The 1st DCA's mandate issued on March 15, 2012.  Ex. B10, ECF Doc. 25-5 at 41.

On May 10, 2013, Petitioner filed a Rule 3.850 Motion for Postconviction Relief in the state circuit court, alleging five ineffective assistance of counsel ("IAC") claims.  Ex. Cl. pp. 1-21, ECF Doc. 25-5 at 45.  Ponder filed a second Motion for Postconviction Relief in the state circuit court on May 20, 2013, which included a "newly discovered evidence" claim, in addition to four IAC claims.  Ex. Cl. pp. 22-45 in ECF Doc. 25-5.  Following an evidentiary hearing on October 22, 2014 (*Id.* at 65-129, ECF Doc. 25-5 at 109-73), the state court denied relief on all five grounds.  *Id.* at 53-56, ECF Doc. 25-5 at 97-100.

Petitioner appealed the denial of his Rule 3.850 Motion to the First DCA (Ex. C1. pp. 57-58, Ex. C3, Ex. C4, Ex. C5 in ECF Docs. 25-5 and 25-6), which initially *per curiam* affirmed without written opinion.  Ex. C6. pp. 1-5 in ECF Doc. 25-6. However, the 1st DCA subsequently granted Petitioner's motion for a written opinion (Ex. C7 in ECF Doc. 25-6) and issued an opinion on December 21, 2016, to address only one issue, that counsel was ineffective for failing to object to "word on the street" testimony. *See Ponder v. State*, 209 So. 3d 59 (Fla. 1st DCA 2016); Ex. C8

---

[3] Judges Wolf, Padovano, and Marstiller concurred in the per curiam affirmance.

in ECF Doc. 25-7.[4]  The 1st DCA's mandate issued on January 6, 2017.  Ex. C9 in ECF Doc. 25-7.

On January 11, 2017, Petitioner filed (per mailbox rule)[5] a *pro se* "Successive Motion for Postconviction Relief 3.850(h)" in the state circuit court alleging a single claim: that his trial counsel was ineffective for failing "to dismiss the indictment or information filed on January 28, 2010[6] thus being fatally defective constituting an incorporation by reference shot gun pleading."  Ex. Dl. p. 6, ECF Doc. 25-7 at 17. The state court entered an order on January 30, 2017 denying Petitioner's motion as successive and untimely (Ex. Dl. pp. 11-12 in ECF Doc. 25-7), and Petitioner appealed the court's ruling to the First DCA.  *Id.* at 13-20.  The First DCA *per curiam* affirmed the postconviction order without written opinion on September 7, 2017 in Case No. 1D17-0908.  *Ponder v. State*, 2017 WL 3909788 at 1 (Fla. 1st DCA Sept. 7, 2017).  Ex. D3, ECF Doc 25-7 at 37.[7]  The court's mandate issued on October 5, 2017.  (Ex. D4).

---

[4] Chief Judge Roberts and Judges Wetherell and Bilbrey concurred in the written opinion.  ECF Doc. 25-7 at 5.
[5] See *Houston v. Lack*, 487 U.S. 266, 275-76 (1988) (Under the "prison mailbox rule," a pro se prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing.).
[6] The January 28, 2010 Information is found at Ex. D1 p. 10 in 25-7.
[7] Judges Bilbrey, Winsor and M.K. Thomas concurred in the *per curiam* affirmance.

Petitioner filed the instant petition on May 15, 2017 (ECF Doc. 1), followed by an Amended Petition for Writ of Habeas Corpus filed on June 15, 2017.  ECF Doc. 6.  The petition is timely.  Petitioner's judgment became final on May 28, 2012, ninety (90) days after the 1st DCA affirmed his judgment and sentence on direct appeal in *Ponder v. State*, 80 So. 3d 1026 (Fla. 1st DCA 2012).[8]  *See Nix v. Secretary for Dept. of Corrections*, 393 F. 3d 1235, 1236-1237 (11th Cir. 2004) ("Because the time for seeking direct review of a criminal conviction does not expire until after the ninety-day period for filing for certiorari with the Supreme Court has ended, the most straightforward and reasonable interpretation of § 2244(d)(l)(A) is that the ninety-day certiorari period does not count towards the one-year limitations period.").  Petitioner's limitations period was tolled on May 10, 2013, when Petitioner filed his Rule 3.850 motion, until May 8, 2017, when the Florida Supreme Court entered its ruling declining to accept jurisdiction to review the 1st DCA's decision in *Ponder v. State*, 209 So. 3d 59 (Fla. 1st DCA 2016).  Because 347 days had expired prior to the statute of limitations period being tolled, Petitioner had eighteen (18) days after May 8, 2017, to file his petition.  Petitioner filed the petition on May 15, 2017, seven (7) days later.

---

[8] The 90-day period begins to run on the date the appellate court enters judgment rather than the date the mandate is issued.  *See Chavers v. Sec'y Fla. Dept of Corr.,* 468 F. 3d 1273, 1275 (11th Cir. 2006).

## II.    Legal Standard

### A.    Federal review of state court decision

Under the standard of review for a § 2254 motion, this Court is precluded from granting a habeas petition on Petitioner's claims unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The United States Supreme Court set forth the framework for a § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).  *See id.*, at 412-13 (O'Connor, J., concurring).  Under the *Williams* framework, a federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *See Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue.  *See Thaler v. Haynes*, 559 U.S. 43, 47 (2010).  Once the governing legal principle is identified, the federal court must determine whether the state court's adjudication is "contrary to" the identified governing legal principle or the state court "unreasonably applie[d] that principle to

the facts of the [] case." *See Williams*, 529 U.S. at 412-13 (O'Connor, J., concurring).

## B.    Ineffective Assistance of Counsel

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).   To obtain relief under *Strickland*, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

*Strickland* mandated one layer of deference to the decisions of trial counsel. 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. . . . Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.").  When § 2254(d) was amended by AEDPA in 1996, Congress added another layer of deference.  *See Harrington*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so.") (citations omitted).  Thus, in the post-AEDPA era, it is a "rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to

merit relief in a federal habeas proceeding." *Johnson v. Sec'y, DOC*, 643 F.3d 907, 911 (11th Cir. 2011).

Additionally, "[i]t is especially difficult to succeed with an ineffective assistance claim questioning the strategic decisions of trial counsel who were informed of the available evidence." *Nance v. Warden, Georgia Diagnostic Prison*, 922 F.3d 1298, 1302–03 (11th Cir. 2019). Decisions about which issues to press during trial are, without a doubt, strategic. *Nance,* 922 F.3d at 1302 (citing *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (per curiam)); *see also Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.").

With respect to the prejudice prong of *Strickland*, Petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner

must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015).

## III.    Analysis

### A.    Ground One – IAC: Failure to Object to "Word on the Street Testimony"

In Ground One, Ponder argues defense counsel was ineffective for failing to object to testimony referring to the "word on the street" identifying Ponder as the shooter. ECF Doc. 6 at 11. This "word on the street" reference was made several times during the trial. First, during opening statements, the prosecutor told the jury they would "hear testimony that there was talk in the community about who the shooter was and that that is how law enforcement developed a suspect in this case." ECF Doc 25-2 at 88. At this point, defense counsel objected: "Judge, I'm going to object to any opening concerning hearsay statements said to that." *Id.* at 89. The judge sustained the objection. *Id.*

> Nevertheless, the prosecutor continued and stated:
>
> Okay. I think it will be clear that law enforcement, through their investigation, through things that were being said in the community, developed the Defendant in this case as a suspect. And once they developed this defendant as a suspect - and then what they do in a lot of cases and a lot of times - Investigator Booth will testify to you that they get suspects, leads from talk coming from the community.

*Id.* Despite objecting to the previous comment, defense counsel did not object to this additional comment.

Next, during Gardner's direct examination, the prosecutor asked whether Gardner was "being given information from either friends or family members about who it was, the name of the person who shot [him]?" *Id.* at 122. Defense counsel did not object to this hearsay testimony. Later, the prosecutor asked Gardner whether he "knew the name, Willie Ponder, at that point because of what people were telling [him]?" *Id.* at 124. Again, defense counsel did not object.

"Word on the street" testimony also came in through the testimony of witness Breanna Morgan. Before Morgan testified, the State proffered her testimony to the judge. ECF Doc 25-2 at 200-09. During the proffer, Morgan repeatedly referred to the shooter by name, as "Willie Ponder," or "Willie", even though she admitted she did not know Ponder and was given his name by someone else. After her proffer, defense counsel told the judge he objected to Morgan's references to Ponder by name, as based on hearsay, and asked that Morgan be directed to "identify in some way the person that shot Mr. Gardner or the shooter or something of that nature." *Id.* at 210. In response, the prosecutor stated, "I'll make sure that it's clear through the testimony that she didn't [know him] at the time." *Id.* The trial court agreed "it would be better to just let [Morgan] talk about the shooter and the person that shot Mr. Gardner rather than using his name and making it appear she knows this person." *Id.* at 211. The court, thus, instructed Morgan to "not refer to [Ponder] by name, you know, unless it's specifically asked of you." *Id.*

Despite the state trial court's instruction, during her direct examination Morgan referred to Ponder by name in describing the events leading up to the shooting. *Id.* at 216. Defense counsel objected to Morgan's initial reference and "request[ed] the witness be directed concerning the court's prior ruling." *Id.* at 216. The trial court overruled his objection without providing any reasoning. *Id.* Defense counsel did not object to Morgan's use of Ponder's name in her testimony again.

Investigator Angie Booth also testified that Gardner gave her "a name that he heard from other people", but he did not know who the person was that shot him. ECF Doc 25-2 at 255. Additionally, she told the jury that she took that information and created the photographic lineup that included Ponder's picture. Defense counsel objected, arguing "facts not in evidence." *Id.* At sidebar, the trial court said:

> I'm not sure that that objection takes us anywhere, Mr. Zelman. But, I mean, if you want a hearsay objection to what they've gathered, I'll sustain a hearsay objection to the whole line of questioning. I don't think it's an appropriate line of questioning, but there's no objection.

Defense counsel then made a hearsay objection, and the trial court sustained the objection, noting "a lot of it is out there" but that defense counsel could cross-examine on it. *Id.* at 256.

Ponder argues the above testimony and argument regarding what Gardner and Morgan heard from other people about Ponder being the shooter is "blatant hearsay", the admission of which violates his right to confront witnesses under the Sixth

Amendment.  He further argues that "[b]ut for the 'word on the street' evidence, the jury would not have convicted Petitioner Ponder.  As such, defense counsel's failure to object to this evidence constituted ineffective assistance of counsel."  *Id.* at 20.

The state court held an evidentiary hearing on Ponder's Rule 3.850 motion, at which defense counsel testified.  ECF Doc. 25-5 at 121.  Counsel testified he knew before trial that "word on the street" evidence would be a feature at trial but declined to file a motion *in limine* on it, although he "probably should have."  *Id.* at 130.  Counsel also explained that once the judge overruled counsel's initial objection to the mention of "word on the street" evidence during Morgan's testimony, "[he] became frustrated and [] didn't want the jury to see [him] object and continue to get overruled on the same issue, so [he] abandoned that."  *Id.* at 134.

In denying relief on this ground, the state court found that the objectionable testimony was hearsay but disagreed that counsel was ineffective.  Instead the court stated that, "Defendant's trial attorney explained that he did not want to object again because it would make him look bad in front of the jury.  I do not find the trial attorney's performance in this area deficient."  ECF Doc. 25-5 at 98-99.  The state court went on to explain that even if counsel's performance was deficient, such ineffectiveness was not prejudicial, stating:

> I can't find, however, that counsel was deficient in failing to file a motion in limine because there was no indication that such testimony would be elicited by the State prior to trial.  Remarks made in opening

statement, moreover, do not constitute evidence.  And, as the Defendant acknowledges, his attorney did object initially to this line of questioning, and the Court seemed to agree, commenting that it was not an appropriate line of questioning, but when counsel objected again, the Court overruled the objection. Defendant's trial attorney explained that he did not want to object again because it would make him look bad in front of the jury.  I do not find the trial attorney's performance in this area deficient.

Even if it was deficient, I don't find the resulting prejudice that the Defendant asserts.  In the context in which the statements were made during the trial, I think most jurors would understand that investigators in a case get a lot of information, tips, leads, etc. and that they run down these leads to the extent possible.  Here, they got a lead based upon some "word on the street" that gave them the Defendant's name.  Such rumors have little value, other than as a possible lead, and then only if confirmed by people who have actual knowledge of the events, e.g., the victim and the other eye witness.  Given the vague, generalized nature of the reference to "word on the street" and how it was used by the investigators, I cannot find any prejudice even had the trial counsel been deficient in not properly objecting to it.  Moreover, trial counsel also reasoned that this testimony played into a defense theory of misidentification because it suggested that the victim and the eyewitness were desperate, or eager at least, to be able to point the finger at someone, even though they couldn't really identify him."

*Id.*

The First DCA affirmed the denial of the claim, finding that the trial court's determination, that there was no prejudice, was "supported by the record."  *Ponder v. State*, 209 F.3d 59, 61 (Fla. 1st DCA 2016).  Specifically, in its written opinion, the 1st DCA stated, "[g]iven the record, we cannot say the circuit erred in concluding ineffective assistance was not demonstrated.  There were several objections made, and when the 'word on the street' references were made, defense counsel used such

[references] to bolster the defense, as noted." *See id.*  Applying the *Strickland* test and the high deference to strategic decisions, the First DCA also stated that "there is a strong presumption that trial counsel's performance was not ineffective."  *Id.*

The First DCA's decision was not contrary to law and was not an unreasonable application of the law to the facts.  Counsel made a tactical decision not to continue objecting, i.e., he did not want to lose favor with the jury, once the judge had overruled his objection.  On cross-examination, counsel admitted that he felt that "word on the street" evidence was "helpful" to his defense because it explained why Gardner and Morgan independently identified Ponder as the shooter on separate days and separate times.  ECF Doc. 25-5 at 141-42.  This explanation was that they were motivated by a desire to convict someone rather than identify the right person.  Indeed, according to defense counsel, he used the "word on the street" evidence to undermine Morgan and Gardner's credibility – to argue that "since so many people were telling him [referring to Gardner] that it was Mr. Ponder, then it had to have been Mr. Ponder."  *Id.*

Because counsel made a strategic decision not to continue to object to "word on the street" reference, after the objection was initially overruled, the state court did not err in determining that Ponder failed to meet the performance prong of *Strickland.  See Strickland*, 466 U.S. at 690; *accord, e.g., Hinton*, 571 U.S. at 274 ("strategic choices made after thorough investigation of law and facts relevant to

plausible options are virtually unchallengeable"); *see also Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009).

Petitioner also fails to meet the prejudice prong of *Strickland.* Here, neither Gardner nor Morgan knew Ponder and yet both identified him on separate instances in a photo lineup. Gardner testified he had a clear look at the shooter's face from only feet away, twice. Although Morgan was not "100% positive" that the person she identified was the shooter, she testified she had a clear view of the shooter and the two made eye contact at one point. ECF Doc. 25 at 35; 25-2 at 224. Additionally, even though Morgan referenced Ponder by name during her testimony, the State also elicited testimony from her that she did now know who Ponder was the night of the shooter. ECF Doc. 25-2 at 216. Similar testimony was obtained by the defense on cross-examination. *Id.* at 230. As defense counsel explained to the judge after the proffered testimony and prior to Morgan's actual testimony, the issue with his objection to Morgan's reference to Ponder by name was that "at the time [of the shooting] she didn't know his name." According to defense counsel, that "is what I'm concerned about." *Id.* at 211. And, that issue was cleared up during the questions to Morgan on direct and cross.

Moreover, the totality of the evidence presented shows that the result would not have been different even if counsel had objected to "word on the street" testimony. *See Williamson*, 805 F.3d at 1016. In contrast to the testimonies of

Gardner and Morgan, who were present at the time of the incident, did not know Ponder, and had vivid recollections of the shooter, the defense's witnesses were all either friends or relatives of Ponder. Whitney Isaac, for example, was Ponder's girlfriend and mother of his child. She testified Ponder was at home with her at the time of the shooting because he was always with her at night. *Id*. at 276. Despite this testimony, Isaac could not recall specific details of that night. *Id.* at 286. Similarly, Marquis Davis grew up with Ponder. *Id.* at 292. Davis testified he saw the group of people involved in the altercation and Ponder was not one of them. ECF Doc. 25-2 at 293. Yet, Davis did not witness the shooting and was three houses away. *Id.* at 294. Davis also gave an oral statement to police, but never told them Ponder was not involved even though he knew Ponder was being accused of the crime. *Id.* Ponder's cousin and another friend also testified Ponder was not the shooter, but like Davis, never reported this information to the police or waited several months before doing so. *Id.*

## C.    Ground Two – IAC:  Failure to Object to Photo Lineup

In Ground Two, Ponder argues defense counsel was ineffective for failing to object to testimony regarding the photographic lineup because the procedures used were unduly suggestive and he provides eleven different bases for his position. ECF Doc. 6 at 26.

During the state court evidentiary hearing, defense counsel testified he did not challenge the lineup procedure because he did not think the challenge would have merit, "based on research that [he] had done in prior cases."  ECF Doc. 25-5 at 138. The First DCA affirmed the state court's order, denying relief, on this ground without written opinion.  Ex. C8 in ECF Doc. 25-7.  Therefore, this Court will "look through" the First DCA decision on this ground and the last related state-court decision that provides a relevant rationale on Ground Two and presume that the unexplained decision adopted the same reasoning.  *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  Here, that last decision comes from the Order Denying Defendant's Motion for Postconviction Relief.  ECF Doc 25-5 at 97.  In that order, the state court agreed with defense counsel that a motion to suppress would be fruitless, because any flaws in the procedure "did not rise to such a level as to justify suppression of the testimony."  ECF Doc. 25-5 at 99-100.  Instead, the state court determined such issues were "more properly addressed by cross examination of the persons involved, and an argument that there was a likely misidentification as a result."  *Id.*

"An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."  *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999); *see also Diaz v. Sec'y, Dep't of*

*Corr.*, 402 F.3d 1136, 1142 (11th Cir. 2008) (finding that appellate counsel was "not ineffective for failure to raise a meritless argument"). Therefore, Ponder must show that a motion to suppress the photographic lineup identification evidence had a substantial likelihood of succeeding under Florida law. *See Williamson v. Fla. Dep't of Corr.*, 805 F.3d at 1016.

Under Florida law, the test for suppression of an out-of-court identification is two-fold: (1) whether the police used an unnecessarily suggestive procedure to obtain the out-of-court identification; and (2) if so, considering all the circumstances, whether the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. *See Rimmer v. State*, 825 So. 2d 304, 316 (Fla. 2002); *Thomas v. State,* 748 So.2d 970, 981 (Fla. 1999); *Green v. State,* 641 So.2d 391, 394 (Fla. 1994); *Grant v. State,* 390 So.2d 341, 343 (Fla. 1980). The factors to be considered in evaluating the likelihood of misidentification include:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Grant,* 390 So.2d at 343 (quoting *Neil v. Biggers,* 409 U.S. 188, 199-200 (1972)). If the procedures used by the police in obtaining the out-of-court identification were not unnecessarily suggestive, however, the court need not consider the second part

of the test.  *See Thomas,* 748 So.2d at 981; *Green,* 641 So.2d at 394; *Grant,* 390 So.2d at 344.

Here, Ponder's allegation that the witnesses were told the suspect was definitely in the photo array is refuted by the record.  Both Gardner and Morgan testified they were told the suspect might not be in the array and that they did not have to choose anyone.  Indeed, Morgan was permitted to note that her identification was not 100% positive.  Also, no witness testified that investigators gave positive feedback to the witnesses, influencing their choices.  Second, the witnesses testified they were able to clearly see the face of the shooter from three to four feet away.  Gardner also testified streetlights were illuminating the area of the shooting.  ECF Doc. 25-2 at 142-43.  Morgan testified she was close enough to the shooter to notice his gold teeth and to hear him say, "I'll rob you and take everything you have."  ECF Doc. 25-2 at 217 & 230-31.

Third, Ponder has offered no evidence that either Morgan or Gardner knew what Ponder looked like prior to identifying him as the shooter in the photo lineup.  Both testified they had not seen Ponder except on the night of the shooting.  Ponder also offers nothing but speculation that Gardner told Morgan he had picked number five on the array and that Morgan would have realized that the police were using the same photo array.  Indeed, she testified during her proffer she was shown three sheets of six photos each, so she would have had to guess which of the three had the fifth

photo that Gardner chose.  Moreover, while Morgan testified that Gardner told him

Ponder's name, there is no testimony that Gardner told her what Ponder looked like.

Finally, Gardner identified the shooter as the person in picture five two days after

the shooting, and Morgan did so eighteen days later.  Thus, an excessive time did

not elapse between the event and the identification.

For these reasons, the undersigned finds that Ponder has failed to overcome

the presumption of correctness afforded to the state court's factual determinations.

Additionally, the state court's decision on this ground was neither "contrary to, or

involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States."  28 U.S.C. § 2254.

### D.    Ground Three – IAC: Failure to Impeach Morgan

In Ground Three, Ponder argues defense counsel was ineffective for failing to

impeach Morgan's identification based upon her "prior inconsistent statements

during her out-of-court identification."  ECF Doc. 6 at 30.  Specifically, Ponder

makes the following argument:

> When Ms. Morgan was looking at the photographic lineup, she asked
> to look at additional photographs, but was told there were no other
> photographs to look at.  (R-39).  Clearly, Ms. Morgan did not believe
> that the shooter was within the lineup.  Then she began looking at the
> photographs she had already seen and began eliminating photographs
> that did not match her memory.  (R-39).  Ultimately, Ms. Morgan
> identified Petitioner Ponder because he most resembled the shooter, but
> stated she was "not positive."  (R-39).  She also stated she did not want
> to come to the police station to view the lineup, but she did because she

was sympathetic to Jamil Gardner and needed to get Petitioner Ponder
off the streets.

*Id.* at 29-30.

As with Ground Two, the First DCA affirmed the state court's order denying this ground without written opinion. Ex. C8 in ECF Doc. 25-7. Therefore, this Court will "look through" the First DCA decision to the Order Denying Defendant's Motion for Postconviction Relief. ECF Doc 25-5 at 97. *See Wilson*, 138 S. Ct. at 1192. In that order, the state court found that "trial counsel did effectively cross examine this witness." ECF Doc. 25-7 at 98.

The state court's findings are supported by the trial transcript. At Ponder's trial, Morgan freely admitted she was only 80-85 percent sure that photo number five was the shooter, and that she wrote a note on the photo array that "it's not really positive, but if I was in person I can show you him." ECF Doc. 25-2 at 224. Also, defense counsel elicited repeated testimony from Morgan that she was not completely sure of her identification. He also pointed out on closing that the State never asked Morgan to identify Ponder in the courtroom. Counsel also questioned Morgan about differences between her testimony on direct and her apparent statements to the investigator that showed her the lineup regarding: (1) what Gardner told her about the identification he made during the photographic lineup, (2) what Gardner had told her about the need to go to the police station to give a report, (3)

the conduct of the shooter after he shot Gardner the second time, and (4) the percentage she was sure of her identification of the shooter. ECF Doc. 25-2 at 234-36. Thus, the state court's finding that counsel's performance in cross examining Morgan was not deficient is not unreasonable.

### E.    Ground Four – Newly Discovered Evidence

In Ground Four Ponder argues the state court erred in not granting a new trial based on "[n]ewly discovered evidence." After the trial, the Florida Department of Law Enforcement received a match on the DNA that was on the hat recovered from the scene and that Gardner testified had been worn by the shooter. The DNA matched that of Gardner, who had just been arrested for an unrelated crime.[9] *Id.* In August of 2011, the State Attorney disclosed that evidence to trial counsel, who forwarded it to Ponder on August 31, 2011. *Id.* at 88.

Ponder contends this new evidence shows that he is actually innocent. ECF Doc. 6. Ponder argued in his Rule 3.850 motion that "[h]ad this evidence been disclosed, defense counsel could have impeached the State's key witness, Jamil Gardner. . . . No jury would have believed Gardner's identification after he insisted that the shooter wore a hat." ECF Doc. 25-5 at 78-79. Thus, "this evidence would likely result in an acquittal at a retrial." *Id.* at 79.

---

[9] The DNA from the hat was entered into the CODIS DNA database. Once Gardner was arrested, his DNA was entered into CODIS, thus resulting in a match. ECF Doc. 25-5 at 87.

As an initial matter, a freestanding claim of actual innocence is not cognizable on federal habeas review. *See Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."); *Townsend v. Sain*, 372 U.S. 293, 317 (1963) ("[T]he existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992); *Cunningham v. Dist. Attorney's Office for Escambia Cty.*, 592 F.3d 1237, 1272 (11th Cir. 2010) ("[T]his Court's own precedent does not allow habeas relief on a freestanding innocence claim in non-capital cases[.]"); *Swindle v. Davis*, 846 F.2d 706, 707 (11th Cir. 1988) ("Newly discovered evidence which goes only to the guilt or innocence of the petitioner is not sufficient to require habeas relief."). This rule "is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Herrera*, 506 U.S. at 400-01.

Furthermore, Petitioner's claim is procedurally barred because nowhere in his state petition does Ponder frame this argument as a violation of the Constitution or federal law. Thus, as the State argues, this claim is unexhausted. *See Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) ("a critical prerequisite for any state petitioner

seeking federal habeas relief is the requirement that he first properly raise the federal constitutional claim in the state courts").

Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all available state court remedies for challenging his conviction, 28 U.S.C. § 2254(b)(1),[10] thereby giving the state the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (*quoting Picard v. Connor*, 404 U.S. 270, 275 (1971) (citation omitted)). A petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard*, 404 U.S. at 277-78. Additionally, "the state court petition must make the state courts aware that the claims asserted do, in fact, raise federal constitutional issues." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

---

[10] Section 2254 provides, in pertinent part:

  (b)(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
      (A)  the applicant has exhausted the remedies available in the courts of the State; or
      (B)      (i)  there is an absence of available State corrective process; or
              (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
      . . . .
  (c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

A claim that was not presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. *O'Sullivan*, 526 U.S. at 839-40; *Bailey v. Nagle*, 172 F.3d 1299, 1302-03 (11th Cir. 1999); *Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (holding that federal habeas courts should enforce applicable state procedural bars even as to claims that were never presented to the state courts). Under Florida law, a claim based on newly discovered evidence must be brought within 2 years of the discovery of the evidence. Fla. R. Crim. P. 3.830(b). Here, the evidence was known to Ponder by August 31, 2011. Thus, he cannot now return to state court and file a 3.850 motion framing this issue as a federal claim.

Because there are no procedural avenues remaining available under Florida law which would allow Ponder to return to the state forum and exhaust the subject claims, the claims are likewise procedurally foreclosed from federal review. *Collier v. Jones*, 910 F.2d 770, 773 (11th Cir.1990) (finding dismissal of federal petition appropriate where the "claims are presented to the federal courts in a posture analogous to claims that have never been presented to a state court, and which have become procedurally barred under state law").

A petitioner seeking to overcome a procedural default must show cause and prejudice, or a fundamental miscarriage of justice. *Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993). "For cause to exist, an external impediment, whether it be

governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497 (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Clearly, no such external impediment existed here. During the 3.850 evidentiary hearing on this issue, defense counsel testified that the State disclosed the new DNA evidence to him "relatively quickly, so that any potential timeliness issues would be avoided." ECF Doc. 25-5 at 128.

The miscarriage of justice exception also does not apply as it requires the Petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. A substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. *Id*.

DNA evidence showing that Gardner's DNA was on the hat is not such evidence. As the state court found, this evidence "may have been helpful at trial in

cross examining the victim and the other eye witness," but it "would not have changed the result of the trial," because "the defense already had the key information concerning the cap, i.e., that the Defendant's DNA was not in it." ECF Doc. 25-5 at 99. Moreover, when Ponder was arrested, his girlfriend told agents he was not home, even though agents found him hiding in an attic, which is not the conduct of someone who is "actually innocent." Thus, Ground Four was procedurally defaulted by Ponder, and, even if it were not, it would nonetheless fail on its merits because the state's court's determination that the DNA evidence did not entitle Petitioner to a new trial was not contrary to law or an unreasonable determination of the facts.

### F.    Ground Five – IAC:  Failure to Dismiss Charging Documents

In Ground Five, Ponder argues defense counsel was ineffective for failing to move to dismiss the charging document. Ponder raised this argument for the first time in his successive 3.850 motion, which was rejected by the state court as untimely. As noted above, Ponder's conviction became final on May 28, 2012, and Ponder failed to file his successive 3.850 on this issue until January 2017, more than 2 years later. *See* Fla. R. Crim. P. 3.850(b) (requiring postconviction motions to be filed within 2 years of the conviction becoming final).

Ponder does not offer any explanation for this delay. The state court thus was not unreasonable in concluding that the claim was time-barred. ECF Doc. 25-7 at 22. Also, the state court reasonably concluded that there was "no good reason the

current ineffective assistance of counsel claim could not have been raised in the original motion" which was filed in May of 2013. *Id.* at 22-23. Thus, the state court found that the claim was procedurally barred as successive as well. *Id.*

Generally, if the last state court to examine a claim states clearly and explicitly that the claim is procedurally barred and that bar provides an adequate and independent ground for denying relief, then federal review of the claim also is precluded by federal procedural default principles. *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Cone v. Bell*, 556 U.S. 449, 465 (2009) ("[W]hen a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review."). The Eleventh Circuit has concluded that the procedural requirements of Florida's Rule 3.850 constitute independent and adequate state grounds under applicable law. *LeCroy v. Sec'y, Fla. Dep't of Corr.*, 421 F.3d 1237, 1260 n.25 (11th Cir. 2005) (citing *Whiddon v. Dugger*, 894 F.2d 1266, 1267-68 (11th Cir. 1990)). Since the state court clearly and explicitly stated that this claim was being denied as untimely and successive, federal review of this claim is precluded.

## G. Evidentiary hearing

The undersigned finds that an evidentiary hearing is not warranted. In deciding whether to grant an evidentiary hearing, this Court must consider "whether

such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). In considering the Petitioner's 3.850 motion, the state court granted Petitioner an evidentiary hearing on all grounds raised. The undersigned does not find that a second evidentiary hearing on the same grounds is necessary, particularly when considering the deferential standards accorded to the state court's factual findings as prescribed by § 2254. *See id.* Upon consideration, the undersigned finds that the claims in this case can be resolved without an evidentiary hearing. *See Schriro*, 550 U.S. at 474.

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

After review of the record, the Court finds no substantial showing of the denial of a constitutional right. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, it is

also recommended that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Rule 11(a), Rules Governing Section 2254 Cases. If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1.   That Petitioner's petition under 28 U.S.C. § 2254 be DENIED, without an evidentiary hearing;

2.   That a certificate of appealability be DENIED; and

3.   That the clerk close this matter.

Done in Pensacola, Florida, this 16th day of October, 2019.


*/s/ Hope Thai Cannon*
**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within 14 days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  A copy of objections shall be served upon the Magistrate Judge and all other parties. A party failing to object to a Magistrate Judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.